**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

GERALD D. DONNELL,

        Plaintiff,

vs.

CITY OF CEDAR RAPIDS, IOWA,
and PAT ENGEL,

        Defendants.

No. 05-CV-49-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

**I.**    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**II.**   **PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**III.**  **JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**IV.**  **STANDARD OF REVIEW FOR SUMMARY JUDGMENT** . . . . . . . . . . . **4**

**V.**   **SUMMARY JUDGMENT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

      **A.**   **The Local Rules** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

      **B.**   **The Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
           **1.**   **Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
           **2.**   **150 Thompson Drive SE** . . . . . . . . . . . . . . . . . . . . . . . . **7**
           **3.**   **Other discoveries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
           **4.**   **Ordered off the job** . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
           **5.**   **"Blowing the Whistle" to the Mayor** . . . . . . . . . . . . . . . . . **9**
           **6.**   **Lins HVAC citations** . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
           **7.**   **Engel arrives** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
           **8.**   **"Closing out" permits** . . . . . . . . . . . . . . . . . . . . . . . . . **12**

|  |  | 9. | *Kathy Graham* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *14* |
|  |  | 10. | *"Blowing the Whistle" to state officials* . . . . . . . . . . . . . . . | *16* |
|  |  | 11. | *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *17* |
|  |  | 12. | *Arbitration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *20* |

**VI.**    **RES JUDICATA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

     **A.**    *General Principles: Arbitration, Federal Court Litigation and Claim Preclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

         1.    **McDonald v. City of West Branch, Mich.** . . . . . . . . . . . **22**

         2.    *Other Supreme Court cases* . . . . . . . . . . . . . . . . . . . . . . **24**

     **B.**    *Application: Preclusion of Pendant State Law Claims* . . . . . . . . . . **25**

         1.    *The Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**VII.**    **THE MERITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

     **A.**    *Count I: Iowa Code § 70A.29* . . . . . . . . . . . . . . . . . . . . . . . . . **32**

     **B.**    *Count II: Common Law Wrongful Discharge* . . . . . . . . . . . . . . . **37**

     **C.**    *Count III: 42 U.S.C. § 1983* . . . . . . . . . . . . . . . . . . . . . . . . . **38**

         1.    *The City* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

         2.    *Engel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

             a.    *Qualified Immunity* . . . . . . . . . . . . . . . . . . . . . . . . **43**

             b.    *Causation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**

**VIII.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

# I.  INTRODUCTION

Before the court is Defendants' Motion for Summary Judgment ("Motion") (docket no. 13).

# II.  PRIOR PROCEEDINGS

On February 1, 2005, Plaintiff Gerald D. Donnell filed a three-count Petition and Jury Demand against Defendants City of Cedar Rapids, Iowa ("City") and Pat Engel in the Iowa District Court in and for Linn County.  Plaintiff claims Defendants, his employer and his supervisor, illegally fired him from his job as a mechanical inspector because he "blew the whistle" on cronyism in the City's Building and Zoning Department ("Department").

In Count I, Plaintiff alleges Defendants violated Iowa's whistle-blower statute, Iowa Code section 70A.29 (2005).  In Count II, Plaintiff alleges common-law wrongful discharge.  In Count III, Plaintiff alleges Defendants violated 42 U.S.C. § 1983 by terminating him for engaging in activity protected by the First Amendment to the United States Constitution.

On March 4, 2005, Defendants filed an Answer, in which they deny the substance of Plaintiff's Petition.  Defendants assert a number of affirmative defenses, including qualified immunity and res judicata.  On March 14, 2005, Defendants removed the case to this court.

On March 3, 2006, Defendants filed the instant Motion.  On March 27, 2006, Plaintiff filed a Resistance.  On April 4, 2006, Defendants filed a Reply.

On May 31, 2006, the court heard oral argument on the Motion.  Lawrence L. Marcucci represented Plaintiff.  William J. Wright represented Defendants.  The court finds the Motion fully submitted and turns to consider it now.

### III. JURISDICTION

Defendants invoke this court's federal question jurisdiction. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Count 3, in which Plaintiff contends Defendants violated 42 U.S.C. § 1983, arises under a law of the United States. The court has supplementary jurisdiction over Counts 1 and 2. *See id.* § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy . . . ."). *But see id.* § 1367(c) (granting district court discretion to decline to exercise supplemental jurisdiction over state law claims under certain circumstances).

### IV. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *Woods*, 409 F.3d at 990.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has

successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Anderson*, 477 U.S. at 248; *Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## V. SUMMARY JUDGMENT FACTS

### A. The Local Rules

Local Rule 56.1(d) requires the moving party to file a response to the resisting party's statement of undisputed material facts, "in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of fact." LR 56.1(d). Moreover,

> [a] reply to an individual statement of material facts that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the moving party's refusal to admit the statement, with citations to the appendix containing that part of the record.

*Id.* "The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." *Id.*

The City does not expressly admit, deny or qualify many of its responses to Plaintiff's statement of undisputed material facts. Indeed, the City does not expressly deny *any* of Plaintiff's proposed undisputed material facts. Instead, the City repeatedly responds, in blanket fashion, that "Plaintiff's allegations . . . are not material."

The Local Rules require a party to admit, deny or qualify an individual numbered statement of fact. *Id.* They do not permit a party to respond that the statement is "not

material," *see id.*, because it is not within the province of the parties to determine the relevance of the facts for purposes of a summary judgment motion.[1]   The City has effectively failed to reply to Plaintiff's numbered statements of material fact; by responding in this fashion, the City completely avoids its obligation to provide the court with citations to the appendix containing the portions of the record that support its refusals to expressly admit Plaintiff's individual assertions of fact.

Accordingly, the court finds the City has violated the Local Rules.  As a sanction, the court deems the City's responses of "not material" as failures to reply and considers Plaintiff's corresponding proposed individual statements of material fact to be admitted for purposes of this summary judgment motion.  *Id.*

### B.  The Facts

As viewed in the light most favorable to Plaintiff, the nonmoving party, and affording Plaintiff all reasonable inferences, the facts are these:

### 1.  Background

Plaintiff is an experienced mechanical inspector.  He has extensive knowledge of city ordinances and related building codes.

On December 10, 2001, the City hired Plaintiff as a Mechanical Inspector for the Department.  Chief Inspector Ed Handley trained Plaintiff.  Plaintiff's training consisted of riding along with Handley for a couple of weeks and taking a few classes on the Cedar Rapids City Code ("City Code").  Handley told Plaintiff "it['s] an easy job and we d[on't] have to do much work."

---

[1] Indeed, the court finds many of the facts which the City unilaterally deems "not material" necessary to a determination in the case.

Dan Schmelzinger, Director of the Department, was Plaintiff's direct supervisor.[2] Schmelzinger had no knowledge of or experience with mechanical codes, city ordinances or mechanical work.

In early 2002, Plaintiff noticed the Department's employees were not conducting proper inspections. The lack of proper inspections was risking the safety of the City's residents.

### 2. 150 Thompson Drive SE

In April of 2002, Plaintiff conducted an inspection of a condominium complex at 150 Thomson Drive SE. On April 17, 2002, Plaintiff wrote a letter to one of the complex's residents, Senior United States District Court Judge Edward J. McManus, and informed him that improper venting of refrigeration units in his building's dormers was a fire hazard and in violation of City Code.[3]

Plaintiff's supervisors were reluctant to take immediate action. Handley was a close friend of Joe Flynn, the contractor who performed the work on the refrigeration units at 150 Thomson Drive SE. Flynn completed the work without the required permits and inspections.

As a consequence of his supervisors' unwillingness to take immediate action, Plaintiff voiced his concerns about the problems at 150 Thompson Drive SE to James Thatcher, the City's Fire Marshal. The two men met and discussed Plaintiff's concerns. Thatcher stated that "[a]fter the meeting I was in no doubt that [Plaintiff's] opinion for enforcement was reasonable" and Plaintiff "has a valid case for . . . enforcement at this

---

[2] Schmelzinger was appointed Director of the Department on July 5, 1999.

[3] Judge McManus and his wife Esther later wrote Schmelzinger to "thank and compliment your mechanical inspector, Jerry Donnell, for promptly recognizing the violations of the City's building, mechanical and fire codes."

site."

On October 22, 2002, Thatcher emailed Schmelzinger and Handley, and he recommended that "the corrections [at 150 Thompson Drive SE] be made prior to the next cooling season." Schmelzinger and Handley were upset that Plaintiff had contacted Thatcher. Schmelzinger and Handley "grilled" Thatcher about his contacts with Plaintiff.

### 3. Other discoveries

In subsequent months, Plaintiff discovered many code violations throughout the City. These code violations were the result of a systematic lack of inspections and enforcement on the part of Department employees. For example, Plaintiff discovered that Schmelzinger issued a permit to Colony Heating and Air Conditioning ("Colony HVAC") for a remodel at 866 Fifth Ave SE two years after the remodel occurred. The remodel was never inspected.

On December 12, 2002, Plaintiff issued a citation to Nancy Ocheltree. Plaintiff alleged that Ocheltree performed mechanical work at 1739 Sixth Avenue SE without a mechanical permit. On March 18, 2003, Ocheltree responded to Plaintiff's December 12, 2002 citation. Ochletree admitted that she had violated the City Code, paid a fine and promised to bring the building into compliance.

### 4. Ordered off the job

After Plaintiff complained about code violations and issued the citation to Ocheltree, Schmelzinger told Plaintiff he was no longer allowed to inspect her work. On January 13, 2003, Schmelzinger ordered that "[a]ll inspections of Ms. O's properties shall be made by [Handley] only." Schmelzinger specifically listed 1739 Sixth Avenue SE as a property Plaintiff should not inspect.

Similar emails followed. For example, on March 14, 2003, Schmelzinger sent Plaintiff an email stating that "[e]ffective immediately, all inspections of work done under

permit by [Lins HVAC] shall be performed by [Handley]. Exceptions will only be made with my approval."

On March 17, 2003, Plaintiff sent Schmelzinger an email in which he asked Schmelzinger for an explanation. There is no evidence in the record that Schmelzinger responded to Plaintiff's email.

By early 2003, Schmelzinger had forbidden Plaintiff from inspecting the work of a number of local contractors which Plaintiff had found in violation of the City Code. These contractors included Lins Heating & Air Conditioning ("Lins HVAC"), Ocheltree, Midwest Heating & A/C Heating Service Co. ("Midwest HVAC") and Colony HVAC. Schmelzinger ordered that only Ed Handley was permitted to conduct inspections on work performed by these contractors.

### 5. *"Blowing the Whistle" to the Mayor*

Realizing that his supervisors were selectively enforcing the City Code in favor of certain preferred contractors, Plaintiff took his concerns about cronyism in the Department to Cedar Rapids Mayor Paul Pate. On April 1, 2003, Plaintiff met with Mayor Pate in Schmelzinger's presence. Mayor Pate told Plaintiff "to take up the issue with . . . Schmelzinger" and, if Schmelzinger did not adequately address Plaintiff's concerns, to contact Mayor Pate again.

On April 17, 2003, Plaintiff wrote Schmelzinger and Mayor Pate a letter in which he voiced his concerns about cronyism in the Department. In pertinent part, Plaintiff wrote:

> I will try and provide as much information as possible to show that we have a situation that has to be corrected when it comes to following codes and City of Cedar Rapids ordinances. When I do my inspections[,] my intent is to enforce both. I have found it is very easy for some people to get special treatment by complaining that I am doing my job. They know

that by complaining the result will be selective enforcement for them. This should not happen. Everyone should be treated the same without bias. I treat everyone the same, so I should be supported in my actions[,] not withdrawn from their inspections. . . . Examples start back when I first started, 150 Thompson Drive SE . . . .

Let['s] talk about some big issues. Nancy Ocheltree for instance. . . . I enforced a stop work order at [1739 Sixth Ave. SE] . . . [N]ext thing I know she has [Schmelzinger] on the phone telling me to get off of her property with no explanation.

. . . . Now I receive an e-mail from [Schmelzinger] demanding that [Handley] be the lone inspector for [Lins HVAC] with no explanation. I am still waiting for a written explanation for this decision. It appears that if a contractor receives a correction notice or I enforce our Ordinances[,] all they have to do is call [Handley] and their problems go away by taking the enforcement away. So far I can['t] do inspections for Nancy Ocheltree, [Lins HVAC], [Midwest HVAC], Heating Service Co., [and] Ernie['s] Plumbing by e-mail from [Schmelzinger] and direction of [Handley]. Who will be next?

On April 30, 2003, Schmelzinger sent Plaintiff a memorandum entitled "Response to April 17, 2003 Missive." Schmelzinger told Plaintiff that he was "removed from dealing with Ms. Ocheltree and Lins Heating" because "our clients perceive . . . that there is a breakdown in service delivery that causes them to question our motivation . . . ." Schmelzinger opined that a mechanical inspector must "demonstrate skill in interpersonal relations"; "[i]n the regulatory environment in which we operate, clearly an effective relationship cannot be established or retained if the client does not feel that he/she is being treated with dignity and respect"; and "the contracting community has a right to expect that, as we conduct our work, our [D]epartment is not negatively impacting the

relationship that they have with their customers through the use of editorial comments or unusual inspection techniques." In the memorandum, Schmelzinger informed Plaintiff that he intended to train all of the Department's employees in improving customer service.

### 6. Lins HVAC citations

On July 14, 2003, Plaintiff inspected two air conditioning systems that were installed by Lins HVAC at 2112 J Street SW. On July 16, 2003, Plaintiff inspected the mechanical work of Lins HVAC at 1211 Ellis Boulevard NW. Plaintiff found the work at both sites was performed without obtaining a permit, in violation of City Code.

On July 17, 2003, Plaintiff ordered an administrative assistant, Pat Pfiffner, to prepare a municipal infraction citation against Marc Lins and Lins HVAC. The citations alleged Lins and Lins HVAC violated the City Code by performing mechanical work on the two air conditioning systems at 2112 J Street SW and 1211 Ellis Boulevard NW without obtaining permits. After preparing the citations, Pfiffner sent them for Schmelzinger's review before they were to be forwarded to Mayor Pate and the Cedar Rapids City Attorney's Office ("City Attorney") for filing in the Iowa District Court in and for Linn County.

On August 5, 2003, Plaintiff asked Pfiffner to call the City Attorney to ask about the status of the citations. The City Attorney told Pfiffner that they had not received the citations. Schmelzinger sent Plaintiff an email in which he stated that "[a]fter reviewing the cases, I determined that there was [sic] not ample reasons to issue a municipal infraction and did not submit them for processing." In truth, the citations were valid.

Pfiffner claims that, on August 8, 2003, Plaintiff attempted to persuade her to submit the July 17, 2003 citations against Lins and Lins HVAC directly to the Mayor's Office. Plaintiff denies this, but admits that he believed Schmelzinger did not have the authority to "pull" citations he issued.

### 7. *Engel arrives*

On August 26, 2003, Schmelzinger resigned from his position as Director of the Department. On August 27, 2003, Pat Engel was appointed Acting Director of the Department.

On August 28, 2003, Plaintiff asked Engel if he could conduct inspections of Lins HVAC's work. Engel told Plaintiff that he could not conduct inspections involving the work of Lins HVAC, Ocheltree or Heating Service.

### 8. *"Closing out" permits*

In September of 2003, Plaintiff was going through lists of "unclosed out permits," i.e., permits for which inspections were not completed. Plaintiff told the building owners to call the Department to request inspections. Plaintiff did not know which contractors had worked on which projects. One of the building owners Plaintiff randomly contacted was Scott Hoeger, a Lins HVAC customer.

On September 3, 2003, Lins and one of his associates, Jeff Dunahugh, contacted Engel and falsely accused Plaintiff of intentionally singling out and harassing Lins HVAC's customers. Dunahugh claimed Plaintiff threatened to shut down Hoeger's business if he did not pay a $500 fine. Plaintiff never made such a statement. In truth, Plaintiff told Hoeger that, if a fine were levied against Lins HVAC and it did not pay the fine, the law might require Hoeger to pay it.

On September 3, 2003, Engel confronted Plaintiff with the allegations raised by Lins and Dunahugh. Engel told Plaintiff that he should not contact Lins HVAC's customers. Plaintiff denied contacting Lins HVAC's customers. Even though Plaintiff had contacted Hoeger, a Lins HVAC customer, Plaintiff's denial was not a lie because, at the time, he did not know who had done the work at Hoeger's business.

On September 3, 2003, Plaintiff wrote Engel an email listing his "greatest

concerns." Among other things, Plaintiff told Engel that there should "be no good ol' boy policy or selective enforcement system within our City Government"; the Department should "[q]uit cheating our citizens out of their money when they pay for . . . inspection[s]"; and the Department should "make sure that all mechanical work is inspected to the best of our ability and put our paid time actually to do such work." Plaintiff sent a copy of the email to Mayor Pate.

On September 5, 2003, Plaintiff conducted an inspection at 3908 Thirteenth Avenue SE and prepared a correction notice. At the time, Plaintiff did not know that Lins HVAC had done the work at 3908 Thirteenth Avenue SE and, therefore, did not intentionally violate Engel's order. Lins complained to Engel and told her he was contacting his attorney.

On September 8, 2003, Engel again told Plaintiff not to contact Lins HVAC's customers or conduct inspections of Lins HVAC's work. That same day, Plaintiff sent Engel an email, in which he complained:

> Our [D]epartment has a serious problem with Lins [HVAC]. They continue to violate our City Ordinances and . . . codes at will. They tell me that they can continue to hide behind the selective enforcement that [Schmelzinger] implemented at Ed Handley[']s and Marc Lins['s] request. I would like to see all of their licenses revoked immediately. They have told me that I am a nobody and [have] harassed my wife's employer. . . . I have sent out registered letters at my own expense to try and stop this behavior but I have not had any response of any sort.

Plaintiff sent a copy of the email to Mayor Pate.

On September 9, 2003, Plaintiff asked Engel if he could file the July 17, 2003 citations against Lins and Lins HVAC that Schmelzinger had withheld in August of 2003. Engel told Plaintiff he could not file the citations. Plaintiff later asked Pfiffner to file the

July 17, 2003 citations, but Pfiffner refused.[4]

### 9. Kathy Graham

On September 9, 2003, Plaintiff contacted Kathy Graham. Plaintiff informed Graham that a final inspection had not been conducted on mechanical work at her home at 5611 Vermont Street SW. Plaintiff told Graham that she needed to get an inspection and should call the Department. At the time, Plaintiff did not know Graham was a Lins HVAC customer; he called her as part of his efforts to "clear up open permits."

On September 11, 2003, Graham called the Department. She was worried about the safety of her home. Engel asked Plaintiff if he had been contacting Lins HVAC's customers. Plaintiff denied knowingly contacting Lins HVAC's customers.

On the same date, Lins called Engel insisting that she meet him at Graham's home. Chief Electrical Inspector Don Harbaugh, Handley and Engel met Lins at Graham's home. The five of them listened to a message on Graham's answering machine. Engel recognized the voice in the message as Plaintiff advising Graham of the need for an inspection.

Graham claims Plaintiff called her "on at least thirteen separate occasions," including four times in one day. Graham believes Plaintiff's continued attempts to contact her amounted to "harassment." Plaintiff denies these allegations. Plaintiff claims Graham called him repeatedly, and Plaintiff simply returned her calls. Eventually, Graham told Plaintiff that she had gotten her money back for the mechanical work Lins HVAC

---

[4] On September 9, 2003, Plaintiff also asked Engel if he could file citations against Robert Miell, a local property owner. It is unclear from the record whether this was part of Plaintiff's attempts to close out permits or whether Miell was a Lins HVAC customer. In any event, Engel told Plaintiff that he should give Miell thirty days to correct the violations. Consequently, Miell was given thirty days. Pfiffner claims Plaintiff asked her to file the citations immediately, but Plaintiff denies it.

performed at her home, and she no longer needed his assistance.

On September 11, 2003, Engel formally ordered Plaintiff in a written memorandum not do any inspections of Ocheltree, Heating Service or Lins HVAC "due to complaints that had been levied against you." Engel further advised:

> This should be considered a direct order. Failure to comply with this directive shall be grounds for imposition of disciplinary action up to and including the termination of your employment.
>
> Please be advised that this is a personnel matter involving you and management. It should not be discussed with anyone in public or anyone who does not have a work related need to know.

At the time Engel issued this order, she was aware that Plaintiff had already consulted Mayor Pate and Thatcher.[5] She was also aware that Plaintiff had contacted Carol Martin, a member of a local organization called Citizens for Responsible Government. Martin is a self-described "citizens' advocate for Cedar Rapids."

On September 19, 2003, Plaintiff wrote Dave Winney, the City's Director of Human Resources. In pertinent part, Plaintiff wrote:

> In the performance of my duties [as mechanical inspector for the City] I have reported various serious violations of the Building Code by certain companies and individuals.
>
> In response to my reports of violations I have been forbidden to inspect the work of some companies and

---

[5] In addition to the meeting with Thatcher in early 2002 regarding 150 Thompson Drive SE, the record contains a series of emails between Plaintiff and Thatcher regarding the safety of the Westdale Court Apartments. The emails begin in July of 2003. In a September 12, 2003 email, Thatcher told Plaintiff that if the problem was not adequately addressed at Westdale Court Apartments, Plaintiff should "begin enforcement procedures."

individuals I have found to be in serious violation.  . . . .

I have expressed my concerns through all available venues within the Building Department from my immediate supervisor through the office of the Mayor.  To date[,] this has resulted in no corrective action against those in serious violation.

Recently I have been reprimanded verbally and by written document.  I feel compelled to inquire why I am being disciplined for taking my responsibility seriously and those operating in violation of the code continue unabated.

Plaintiff sent a copy of the letter to Mayor Pate, Engel and the Cedar Rapids City Council.

### 10.  *"Blowing the Whistle" to state officials*

On September 20, 2003, Plaintiff wrote James Kenkel, the State Fire Marshal. Plaintiff told Kenkel that there were fire hazards at Westdale Court Apartments and 150 Thompson Drive SE.  Plaintiff informed Marshal Kenkel that "occupants are at risk" and "[f]ires will continue to occur" at the Westdale Court Apartments.  Plaintiff informed Marshal Kenkel that Schmelzinger and Handley had put up "considerable resistance . . . to require the contractor to [abate the fire hazard.]"  Plaintiff informed Marshal Kenkel that he had "considerable evidence of many more mechanical and fire code violations, which I can furnish if you so cho[o]se.  I am requesting your assistance.  Please contact me at your earliest convenience."

On September 23, 2003, Plaintiff wrote Iowa Attorney General Thomas J. Miller to voice his concerns about cronyism within the Department.

At some time prior to September 29, 2003, Plaintiff wrote the Building Code Bureau of the Iowa Department of Public Safety ("IDPS-BCB") about the cronyism in the Department.  On September 29, 2003, Rich Bollen, Facilities Engineer for IDPS-BCB,

declined to help. He stated that "these types of violations fall under the auspices of the local authority having jurisdiction . . . [Y]ou should pursue the matter with either the local city manager, city council, or[,] if necessary[,] the county attorney."

Engel discovered Plaintiff's attempts to contact Kenkel and Miller. On September 24, 2003, Engel wrote in another memorandum:

> Various allegations have been made regarding contacts to customers and employees being made regarding the on-going investigation. You were ordered in the memo dated September 11, 2003, that the investigation is a personnel matter involving you and management and should not be discussed with anyone in the public or anyone who does not have a work-related need to know. . . . . You are not to discuss the investigation being conducted with anyone who does not have a work-related need to know. This includes potential witnesses, as well as customers and other employees. If there are individuals you believe need to be contacted, then that information needs to be known to the Human Resources Director, David Winney . . . to contact on your behalf. If you fail to heed this order, you will be subject to immediate disciplinary action including but not limited to suspension with or without pay at the discretion of management.

Plaintiff acknowledged receipt of this memorandum with his signature.

On September 26, 2003, Engel received a letter from Lins' attorney. Lins' attorney expressed his client's concerns about Plaintiff and demanded that the City "investigate this matter without delay and take appropriate remedial action to halt any further injurious activity" against Lins HVAC and Lins.

### 11.    *Termination*

On September 26, 2003, Engel placed Plaintiff on administrative leave. On October 17, 2003, Winney held a "Predisciplinary Hearing." At the hearing, Engel alleged, among other things, that Plaintiff (1) made inappropriate statements outside of his job

responsibilities, (2) stated that inspectors were "crooked" and taking bribes, (3) stated that the Department was paying too much for products, (4) repeatedly contacted customers of contractors, (5) defamed the professional reputations of certain contractors and impacted their livelihoods and threatened to shut down a business if a contractor did not pay a $500 fine, (6) "[c]onducted [himself] in a way that is detrimental to the good name of the City," and (7) told others that he was going to be fired.

Plaintiff denies the allegations Engel made at the Predisciplinary Hearing. For example, Plaintiff denies that he alleged that people in the Department were taking bribes or were crooked. Plaintiff has consistently believed that the Department has favorites and refuses to enforce the law against certain contractors. In essence, Plaintiff accuses the Department of cronyism, not graft.

At the Predisciplinary Hearing, Engel addressed Plaintiff and stated she placed him on administrative leave because:

> . . . You basically refused to work with [Handley] and not work . . . within the system but [went] outside the system [to] involve other parties as opposed to working within the system . . . .
>
> [Y]ou came in on [September 26, 2003] and . . . insisted that you were going to go to the attorney general, and you were advised that we have certain processes available . . .

On November 21, 2003, the City terminated Plaintiff's employment. Engel wrote:

> It was determined that there was just cause for disciplinary action to the level that warrants termination of employment. . . . The decision to end the employment relationship was based on the charges of disobedience and insubordination, failure to properly perform duty and fulfill responsibilities as an employee (mechanical inspector), neglect of duty,

18

> misconduct—detrimental to public service, violating Municipal
> Code section 36.04, dishonesty, and other such acts which are
> not in the best order of carrying out municipal works.

Engel informed Plaintiff of his right to appeal the decision under a collective bargaining agreement between the City and Plaintiff's union, AFSCME Local 620 ("Union").

Contrary to his formal letter of termination, Plaintiff's version of events is corroborated by Martin and Winney. In an affidavit, Martin testifies:

> I know Jerry Donnell. He called me a year before he was
> terminated. I understood him to be a mechanical safety
> inspector. I also understood that he had serious issues with the
> way that the [D]epartment he worked for was being run. What
> caught my attention was the safety issue. I investigated. That
> investigation made me conclude that Jerry Donnell was right.
> The work done is often incomplete and not properly
> documented. He lost his job for taking steps to make the
> mechanical building process legal and safe.
>
> [W]hen a mechanical device goes into a home or an
> apartment a permit must be issued. Within one year, that
> permit must be closed out with an inspection. That inspection
> is often not done. Contractors get favoritism and Jerry
> Donnell was kept away from those contractors because he
> demanded safety first.
>
> I did not accept Jerry Donnell's word on its face. I
> checked it out. I have access to city officials and politicians.
> . . . . I talked to Mr. Handley . . . and he indicated that often
> times a year goes by without the permit inspection . . . .
>
> It was confirmed to me that Mr. Donnell was ordered
> not to talk to certain contractors. . . .
>
> I talked to Mayor Pate about Jerry Donnell. . . . Jerry
> Donnell got fired the week after I talked to the Mayor.
>
> I previously asked the city council to get involved and
> force an audit [of the Department] but they have not.
>
> I wrote Dave Winney . . . after speaking with Kathy
> Graham, on more than one occasion. As my letter indicates,

> she never uttered one word of complaint regarding [Plaintiff].
>
> I believe that Jerry Donnell was wronged. I feel he was standing up for himself and in standing up for himself he stood for all the citizens of Cedar Rapids. For his efforts, he lost his job.

Similarly, Winney acknowledged Plaintiff's concerns in a confidential memorandum dated October 3, 2003. Winney requested an audit of the Department due to "possible problems in mechanical inspections process and procedures that show inefficiency (at the very least) . . . There may not have been follow-ups on citations or corrections needed and cited." Winney believed there were "questions that need to be answered to resolve perceived serious problems that might be putting the City at risk or that could be appropriately answered." Winney cited "several internal employee sources" for his information.

### 12. *Arbitration*

On December 11, 2003, the Union filed a grievance on behalf of Plaintiff. The Union contested Plaintiff's termination on the ground that the City did not have "just cause" to terminate him. Pursuant to Article 8 of the Union-City collective bargaining agreement ("CBA"), the City "agrees that it will not discharge or suspend any employee except for just cause."[6] On December 18, 2003, Randy Helt, the City's Collective Bargaining Representative, sent the Union's president, Wayne Clymer, a letter in which he stated the City was denying the Union's grievance.

On April 20 and 21, 2004, Arbitrator Hugh J. Perry conducted a hearing on the Union's grievance against the City. On April 21, 2004, Arbitrator Perry issued a decision denying the grievance. Arbitrator Perry concluded the City had "just cause" under Article

---

[6] The CBA is not part of the summary judgment record, and the vast majority of its contents are unknown to the court. Article 8 of the CBA is reprinted in the arbitration decision, which is part of the summary judgment record.

8 of the CBA to terminate Plaintiff's employment.

Arbitrator Perry's decision contains only two paragraphs of analysis. In those paragraphs, Arbitrator Perry acknowledged that Plaintiff is "a competent mechanical inspector" who "worked to eliminate some significant safety hazards" and had a "commendable" goal of closing out stale permits. Nonetheless, the Arbitrator Perry found that Plaintiff (1) "made a threatening call to a citizen"; (2) "went on a one man crusade to rectify what he saw as problems in the [D]epartment, focusing on one specific contractor"; (3) "accused another inspector of taking bribes and a contractor of paying them"; (4) "exposed [the City] to liability"; (5) "contacted certain customers after being told repeatedly not to do so"; (6) "disobeyed the clear and direct orders of his superiors"; (7) "attempted to circumvent his acting director"; and (8) "[w]hen confronted about such conduct, was untruthful."

Arbitrator Perry acknowledged that progressive discipline—as opposed to outright termination of an employee with an otherwise clean disciplinary record—was ordinarily required under the CBA. Arbitrator Perry concluded, however, that Plaintiff could not be rehabilitated and his future conduct and performance could not be improved.

## VI. RES JUDICATA

As a threshold matter, Defendants claim a jury should not be allowed to hear Plaintiff's state law claims because Arbitrator Perry determined there was "just cause" under the CBA for the City to fire him. In other words, Defendants claim Arbitrator Perry's denial of the Union's grievance against the City precludes, as a matter of law, any finding by a jury in favor of Plaintiff on his state law claims.

Defendants invoke the doctrine of res judicata. Generally speaking, res judicata, also known as "claim preclusion," is a legal doctrine that "operates to preclude a party from relitigating the same cause of action." *Wedow v. City of Kansas City, Mo.*, 442 F.3d

661, 669 (8th Cir. 2006) (citing *Lundquist v. Rice Mem'l Hosp.*, 238 F.3d 975, 977 (8th Cir. 2001)); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").

### A. General Principles:
### Arbitration, Federal Court Litigation and Claim Preclusion

At the outset, the court recognizes what Defendants do *not* argue. Defendants do not argue that res judicata bars Plaintiff's Section 1983 claim. Supreme Court precedent forecloses this avenue of argument. In *McDonald v. City of West Branch, Michigan*, 466 U.S. 284 (1984), the Supreme Court held that an award in an arbitration proceeding brought pursuant to a collective-bargaining agreement cannot preclude a subsequent suit in federal court under Section 1983. Because *McDonald* and other Supreme Court cases set forth the analytical framework the court must apply, however, the court deems it appropriate to discuss them now.

### 1. McDonald v. City of West Branch, Mich.

In *McDonald,* a fired police officer filed a grievance pursuant to a collective bargaining agreement between his employer and his union. *Id.* at 285-86. The arbitrator held that there was "just cause" for his discharge. *Id.* at 286. The fired police officer did not appeal the arbitrator's decision in state court. *Id.* Instead, he filed a Section 1983 action in federal court. *Id.* The Supreme Court considered "whether a federal court may accord preclusive effect to an unappealed arbitration award in a case brought under § 1983." *Id.* at 285.

The Supreme Court first considered whether the Full Faith and Credit Statute, 28 U.S.C. § 1738, obliged federal courts to give preclusive effect to an arbitration award. *McDonald*, 466 U.S. at 287-88. The Full Faith and Credit Statute provides that "judicial

proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States . . . as they have . . . in the courts of such State . . . ." 28 U.S.C. § 1738. The Supreme Court held the Full Faith and Credit Statute does not apply to arbitration awards because arbitration decisions are not "judicial proceedings." *McDonald*, 466 U.S. at 288.

The Supreme Court next considered whether the federal common law doctrine of res judicata required federal courts to give preclusive effect to the arbitration award. *See id.* (considering whether a rule of preclusion was properly "judicially fashioned"). The Supreme Court wrote:

> [Arbitration] cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory rights that § 1983 is designed to safeguard. As a result, according preclusive effect to an arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting federal rights. . . .
>
> First, an arbitrator's expertise pertains primarily to the law of the shop, not the law of the land. An arbitrator may not, therefore, have the expertise required to resolve the complex legal questions that arise in § 1983 actions.
>
> Second, because an arbitrator's authority derives solely from the contract, an arbitrator may not have the authority to enforce § 1983. . . . The arbitrator has no general authority to invoke public laws that conflict with the bargain between the parties. . . . .
>
> Third, when, as is usually the case, the union has exclusive control over the "manner and extent to which an individual grievance is presented," there is an additional reason why arbitration is an inadequate substitute for judicial proceedings. The union's interests and those of the individual employee are not always identical or even compatible. As a result, the union

> may present the employee's grievance less vigorously, or make different strategic choices, than would the employee. Thus, were an arbitration award accorded preclusive effect, an employee's opportunity to be compensated for a constitutional deprivation might be lost merely because it was not in the union's interest to press his claim vigorously.
>
> Finally, arbitral factfinding is generally not equivalent to judicial factfinding. . . . [T]he record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable.

*Id*. at 290-91 (citations, alterations, internal quotation marks and footnotes omitted). The Supreme Court also noted that many arbitrators are not lawyers, "the union's case in a labor arbitration is commonly prepared and presented by non-lawyers" and "under most collective bargaining agreements the union controls access to the arbitrator, the strategy and tactics of how to present the case, the nature of the relief sought, and the actual presentation of the case." *Id*. at 290 n.9 & 291 n.10.

In sum, the Supreme Court held that, "in a § 1983 action, an arbitration proceeding cannot provide an adequate substitute for a judicial trial." *Id*. at 291. "[A]ccording preclusive effect to arbitration awards in § 1983 actions would severely undermine the protection of federal rights that the statute is designed to provide." *Id*. Therefore, "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective bargaining agreement." *Id*.

### 2. Other relevant Supreme Court decisions

The Supreme Court's decision in *McDonald* is consistent with its decisions in other

statutory contexts. An award in an arbitration proceeding brought pursuant to a collective bargaining agreement does not preclude a subsequent suit in federal court under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, or the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 206 *et seq. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 55-56 (1974) (Title VII); *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 745-56 (1981) (FLSA). "Congress intended [Title VII and the FLSA] to be judicially enforceable and . . . arbitration [cannot] provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes." *McDonald*, 466 U.S. at 289.

## B. Application: Preclusion of Pendant State Law Claims

### 1. The Arguments

As indicated, Defendants concede the arbitration decision in this case does not preclude Plaintiff from bringing his Section 1983 claim in this court. The fighting issue is whether the arbitration decision in Defendants' favor also precludes Plaintiff's two pendant state law claims. Defendants claim that, because they have conceded that the arbitration decision does not preclude Plaintiff's Section 1983 claim, the court should disregard *McDonald* entirely and instead separately apply state law res judicata principles to Plaintiff's state law claims. Defendants cite *Woodruff v. Associated Grocers of Iowa*, 364 N.W.2d 215 (Iowa 1985), for the proposition that wrongful discharge and whistleblower claims should be dismissed pursuant to state common law res judicata principles because they "draw [their] essence" from a collective bargaining agreement. *Woodruff*, 364 N.W.2d at 216. Plaintiff contends the court should follow *McDonald* and apply federal law.

### 2. Analysis

The court can find no binding precedent which requires the court to treat Plaintiff's

state law claims differently than his Section 1983 claim.  Given the analytical framework set forth in *McDonald*, *Gardner-Denver* and *Barrentine*, the court concludes it would be improper to grant Arbitrator Perry's decision preclusive effect on Plaintiff's state law claims.

Applying the Supreme Court's analytical framework, the court must first determine whether there is a federal constitutional provision or federal statute that requires the court to give preclusive effect to Arbitrator Perry's award.  *See, e.g., McDonald*, 466 U.S. at 288.  If not, then the court must apply federal common law to determine whether any judicially created rule of preclusion applies.  *See, e.g., id.* (holding that, in the absence of a constitutional or statutory provision that requires the court to give res judicata effect to an unconfirmed arbitration award, "any such rule of preclusion would have to be judicially created"); *see also Semtek Int'l, Inc. v. Lockheed Martin Corp*, 531 U.S. 497, 508 (2001) (applying federal common law to decide claim-preclusive effect of prior judgment in absence of constitutional or statutory rule).

As in *McDonald*, there is no federal constitutional provision or federal statute that requires the court to give preclusive effect to Arbitrator Perry's unconfirmed arbitration award.  For example, the Full Faith and Credit Statute, 28 U.S.C. § 1738, does not apply because arbitration is not a "judicial proceeding."  *McDonald*, 466 U.S. at 287-88 (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982)); *see also Semtek,* 531 U.S. at 506-07 (recognizing that Full Faith and Credit Statute only applies to state court proceedings).

In the absence of a federal constitutional provision or federal statute, the court must turn to consider whether a judicially created rule of preclusion applies.  *See, e.g., McDonald*, 466 U.S. at 288.  In other words, the court must apply federal common law. In this case, the federal common law requires the court to apply federal res judicata

principles to determine the preclusive effect of Arbitrator Perry's decision upon Plaintiff's pendant state law claims. This is a federal question case, not a diversity case. The Supreme Court has held that, in federal question cases, federal courts must apply federal res judicata principles to determine the preclusive effect of a prior judgment. *See Blonder Tonque Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12 (1971) ("In federal-question cases, the law applied is federal law. This Court has noted, "It has been held in non-diversity cases since *Erie R. Co. v. Tompkins*, that the federal courts will apply their own rule of res judicata.'" (quoting *Heiser v. Woodruff*, 327 U.S. 726, 733 (1946)); *cf. Follete v. Wal-Mart Stores, Inc.*, 41 F.3d 1234, 1237 (8th Cir. 1994) ("When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment."). This rule appears to be consistent with the present practice of the Eighth Circuit Court of Appeals in arbitration cases. *See, e.g., Patterson v. Tenet Health Care, Inc.,* 113 F.3d 832, 838 (8th Cir. 1997) (applying federal law in a federal question case to determine whether pendant state law claims were subject to arbitration) (citing *Prudential Ins. Co. v. Lai*, 42 F.3d 1299, 1303 n.1 (9th Cir. 1994)); *Swenson v. Mgmt. Recruiters Int'l, Inc.*, 858 F.2d 1304, 1309-10 (same) (citing, in part, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)), *overruled on other grounds by Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)). *But see Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1014 (8th Cir. 2002) ("[T]he res judicata effect of the first forum's judgment is governed by the first forum's law, not by the law of the second forum.").[7]

---

[7] The court recognizes this area of the law is unsettled. "[T]he federalistic aspects of res judicata are no more bewildering than in addressing the broad question of whether

(continued…)

Under the federal law of res judicata, preclusion applies "when there is a prior judgment rendered by a court of competent jurisdiction, that prior judgment was final on the merits, and it involved the same cause of action and the same parties or privies." *Wedow*, 442 F.3d at 669 (citing *Banks v. Int'l Union Elec., Elec., Tech., Salaried & Mach. Workers*, 390 F.3d 1049, 1052 (8th Cir. 2004)). Res judicata "operates to preclude a party from relitigating the same cause of action." *Id.* (citing *Lundquist*, 238 F.3d at 977). "Res judicata bars claims that were or could have been litigated in the prior proceeding . . . ." *Id.* The Eighth Circuit Court of Appeals has cautioned that "'the party against whom res judicata is asserted must have had a full and fair opportunity to litigate

_____

[7](...continued)

state law should effect the rule applied to federal adjudication of questions controlled by state law." Wright & Miller, 18B *Fed. Prac. & Proc. Juris.* 2d § 4472. The court finds the *Canady* line of cases is inapplicable in the case at bar because here there was no prior court proceeding. Arbitrator Perry did not purport to apply any law whatsoever; instead, he simply gave his own commonsense understanding of whether there was "just cause" to terminate Plaintiff under the CBA between the Union and the City. The court cannot apply "the first forum's law" unless the court adopts the legal fiction that Arbitrator Perry applied state law. The court declines to adopt this legal fiction. Moreover, the *Blonder* rule avoids the incongruities that might result were the court to apply federal res judicata principles to Plaintiff's Section 1983 claim and apply state res judicata principles to his pendant state law claims.

> If federal courts do come to the conclusion that some special federal interests justify departure from state rules as to a federal question, [*e.g.*, a Section 1983 claim by virtue of the principles expressed in *McDonald*], it might seem artificial and unjust to apply preclusion to related state questions. Disposition of the federal claim by findings that are inconsistent with the results achieved by preclusion as to a state claim is obviously awkward.

Wright & Miller, 18B *Federal Prac. & Proc. Juris 2d* § 4472.

the matter in the proceeding that is to be given preclusive effect.'" *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998) (quoting *In re Anderberg-Lund Printing Co.*, 109 F.3d 1343, 1346 (8th Cir. 1997)).

Applying federal res judicata principles, the court finds Arbitrator Perry's decision should not be given preclusive effect over Plaintiff's state law claims. The arbitration decision was written by an arbitrator, not "rendered by a court of competent jurisdiction." *Wedow*, 442 F.3d at 669 (citing *Banks*, 390 F.3d at 1052).

Moreover, nothing shows that the arbitration decision was "final on the merits." *Id*. Unlike most reported cases, the CBA is not part of the record. As a consequence, there is nothing in the record which suggests that the CBA is a binding agreement, and the scope of the CBA is unclear. If the CBA is non-binding, then clearly Plaintiff could institute his state law claims. Waivers of rights in a collective bargaining agreement must be clear and unmistakable. *Wright v. Univ. Maritime Serv. Corp.*, 525 U.S. 70, 80 (1998); *see also id*. (holding a collective bargaining agreement that purported to resolve "all matters" did not preclude plaintiff from bringing a claim against his employer under the Americans with Disabilities Act). "[T]he right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA." *Id*.

The only evidence regarding the CBA's scope in this case comes second-hand through Arbitrator Perry's decision and implies that the CBA was not intended to preclude a union member from filing an action in state or federal court. Arbitrator Perry quoted the CBA as stating that "[t]he arbitrator shall be limited to interpreting the Agreement and applying it to the particular case presented to him." Unlike other collective bargaining agreements—agreements which the Supreme Court has declined to grant preclusive effect—there is no evidence in the record that the CBA even purports to resolve any common law claims arising out of the transaction. *See, e.g., Gardner-Denver*, 415 U.S.

at 54 (purporting to resolve "any dispute, claim or controversy" between the parties). The court also recognizes that, ordinarily, "labor arbitrators are generally only authorized under [collective bargaining agreements] to resolve contractual . . . claims." *Patterson*, 113 F.3d at 837 (citing *Gilmer*, 500 U.S. at 34).

In sum, the court cannot simply assume that the CBA (1) is by its own terms binding upon all parties and (2) purports to resolve all state law claims between union members and the City. "'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers, Shopman's Local 493 v. EFCO Corp. & Constr. Prods., Inc.*, 359 F.3d 954, 955-56 (8th Cir. 2004) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). By failing to introduce the CBA into evidence, Defendants have clearly failed to meet their "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Put simply, nothing in the record indicates that, in the CBA, Plaintiff agreed to submit all disputes he had with the City to an arbitrator for binding resolution. *Cf. Patterson*, 113, F.3d at 834-35 (noting employee agreed to accept the final decision of the arbitrator as the "ultimate resolution of my complaint(s) for any and all events that arise out of employment or termination of contract"); *Swenson*, 858 F.2d at 1305 n.2 (noting employee "signed an agreement with her employer containing a provision requiring arbitration of controversies between the parties").[8]

---

[8] The case at bar is unlike *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), in which the Supreme Court distinguished *McDonald*, *Gardner-Denver* and
(continued...)

The court is also concerned that Plaintiff did not have "'a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect.'" *Costner,* 153 F.3d at 673 (quoting *Anderberg-Lund*, 109 F.3d at 1346). Plaintiff was not represented by his own counsel at the hearing. Indeed, Plaintiff was not a party to the CBA. The Union's interests and the Plaintiff's interests are not necessarily the same. *McDonald*, 466 U.S. at 290-91. The Supreme Court has noted the tension between the collective

---

[8](...continued)
*Barrentine*. In *Gilmer*, the Supreme Court held that a defendant employer could compel arbitration of the plaintiff employee's complaint based on the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* *Gilmer*, 500 U.S. at 23. The plaintiff had registered with a stock exchange. *Id.* In his registration application, the plaintiff agreed to arbitrate all disputes with his employer. *Id.* In distinguishing *McDonald*, *Gardner-Denver* and *Barrentine*, the Supreme Court wrote:

> There are several important distinctions between the *Gardner-Denver* line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue of whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case.

*Gilmer,* 500 U.S. at 35.

representation of the Union and Plaintiff's individual rights.  *See Gilmer*, 500 U.S. at 35.[9]

Accordingly, the court declines to grant preclusive effect to Arbitrator Perry's decision.  Res judicata does not bar Plaintiff from bringing his pendant state law claims in federal court.  Therefore, the court turns to consider Defendants' arguments on the merits of Plaintiff's three claims.

## VII.  THE MERITS

### A.  Count I: Iowa Code § 70A.29

In Count I, Plaintiff alleges Defendants violated Iowa Code section 70A.29.  Iowa Code section 70A.29 is the so-called "whistleblower" statute for municipal employees.

---

[9] Indeed, it is presently an open question whether an individual worker's federal forum rights could *ever* be waived in a union-negotiated collective bargaining agreement. *See, e.g., Wright*, 525 U.S. at 77 (recognizing there is "assuredly . . . support" for such a view, even though federal forum rights can be waived in "individually executed contracts").  Although Plaintiff seeks to enforce a state common law right and a state statutory right as opposed to a federal statutory right, the Supreme Court's admonition in *Barrentine* is instructive:

> [A petitioner's rights in federal court] are independent of the collective-bargaining process. They devolve on petitioners as individual workers, not as members of a collective organization. They are not waivable. . . . . In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under [the statute], an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Barrentine*, 450 U.S. at 745-46 (citations and internal quotation marks omitted).

*Hill v. Iowa Dep't of Employment Servs.*, 442 N.W.2d 128, 131 (Iowa 1989); *see also Smuck v. Nat'l Mgmt. Corp.,* 540 N.W.2d 669, 672 (Iowa Ct. App. 1995) ("Iowa's whistle-blower statute, Iowa Code section 70A.29, applies only to public employees . . . ."). In pertinent part, the statute provides:

> A person shall not discharge an employee from . . . a position in employment by a political subdivision of this state as a reprisal for a disclosure of any information by that employee to . . . an official of that political subdivision or a state official or for a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety . . . .

Iowa Code § 70A.29(1).

Iowa Code section 70A.29 creates a private right of action. *See id.* § 70A.29(3) ("Subsection 1 may be enforced through a civil action."). If the employee proves a violation of the statute, the remedy may include various forms of equitable relief, including reinstatement, with or without back pay, attorney fees and costs. *Id.* § 70A.29(3)(a).[10] By its plain terms, the statute "reveals an umbrella of protection from retaliatory discharge" and "prohibits actions by those who exercise governmental authority from undermining this public policy and from stifling whistle-blowers in the workplace." *Cf. Worthington v. Kenkel*, 684 N.W.2d 228, 233 (Iowa 2004) (discussing Iowa Code section 70A.28, Iowa's parallel whistleblower statute for employees of the State of Iowa).

Defendants claim Plaintiff's whistle-blower claim must fail because "there is absolutely no evidence . . . Plaintiff was discharged for disclosing any information to

---

[10] Violation of the statute is also a criminal offense. Iowa Code § 70A.29(2).

public officials." Although Defendants concede that Plaintiff disclosed information to public officials, Defendants claim "the evidence establishes . . . Plaintiff was discharged for disobeying the clear and direct orders of his supervisors not to inspect the work of certain contractors or contact their customers, being untruthful about doing so when confronted about such conduct and attempting to circumvent . . . Engel to get citations issued." In sum, Defendants claim Plaintiff was not fired "as a reprisal for a disclosure of any information." Iowa Code § 70A.29.

Defendants' argument is essentially one of causation. Causation, however, is generally a question for the jury. *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002); *accord Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000) ("Generally, causation presents a question of fact. Thus, if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute."). It can, however, "provide the basis for summary judgment when 'the question is so free from doubt as to justify taking it from the jury.'" *Naucke,* 284 F.3d at 928 (citing *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994)).

This case presents a classic question of fact for the jury. There are two sides to this story. The jury could find, as Defendants allege, that Plaintiff intentionally disobeyed the orders of his supervisors, lied to his supervisors and harassed contractors and their customers in a misguided crusade to enforce the City Code. Alternatively, the jury could find, as Plaintiff alleges, that the Department is rife with a deep-seated cronyism that endangers the safety of the City's residents; when Plaintiff sought to "blow the whistle" on the cronyism, he was fired.

Plaintiff denies Defendants' allegations of dishonesty in a sworn affidavit. He also denies most, if not all, of Defendants' allegations of insubordination. Defendants' argument regarding Plaintiff's insubordination contradicts the purpose of a whistle-blower

statute. Defendants essentially allege Plaintiff violated their orders to keep him from detecting and exposing their cronyism. In other words, Defendants appear to argue that an employer can order an employee not to "blow the whistle," fire the employee for not following orders and then escape liability under Iowa Code section 70A.29.

The court finds Defendants' argument unpersuasive as a matter of law. A statute must be interpreted consistently with its purpose and in a commonsense manner that avoids absurd results. *Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 717 (Iowa 2005) (citing *IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001)); *State v. Petithory*, 702 N.W.2d 854, 859 (Iowa 2005) (stating that the Iowa Supreme Court interprets statutes in a commonsense manner and will avoid absurd results). To permit an employer to order an employee not to blow the whistle and then fire him when he does would completely undermine the purpose of a whistleblower statute, which "reveals an umbrella of protection from retaliatory discharge" and "prohibits actions by those who exercise governmental authority from undermining this public policy and from stifling whistle-blowers in the workplace." *Cf. Worthington*, 684 N.W.2d at 233 (discussing Iowa Code § 70A.28).

Even if the court were to assume that Plaintiff knowingly and repeatedly violated the orders of his supervisors to stop investigating the work of certain contractors, summary judgment would not be appropriate. Crucial to Plaintiff's case is the timing and severity of the discipline leveled against him. It is important to note that Defendants did not place Plaintiff on administrative leave until September 26, 2003—about the same time Plaintiff began "blowing the whistle" on the Department to non-City officials, such as the Iowa Attorney General and the State Fire Marshal. Where the timing of the termination is suspicious, summary judgment may not be appropriate in an employment action. *See, e.g., Smidt v. Porter*, 695 N.W.2d 9, 15-16 (Iowa 2005) (holding fact that employer

terminated pregnant employee the day before employee was scheduled to meet employer to discuss maternity leave was suspicious) (citing, in part, *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1079 (8th Cir. 2005) ("A plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events.")).  When Defendants took action against Plaintiff, they did not impose progressive discipline for an employee with an otherwise clean record; instead, Defendants took the most severe action, that is, they fired him.

In addition to the circumstantial evidence that Defendants fired Plaintiff for "blowing the whistle" on cronyism in the Department, there is also direct evidence in this case.  Engel admitted that Plaintiff's attempt to contact state officials was the determining factor in his discharge.  At the Predisciplinary Hearing, Engel, addressing Plaintiff, stated that she placed him on administrative leave because:

> . . . You basically refused to work with [Handley] and not
> work . . . within the system but [went] outside the system [to]
> involve other parties as opposed to working within the system
> . . . .
>
> [Y]ou came in on [September 26, 2003] and . . . insisted that
> you were going to go to the attorney general, and you were
> advised that we have certain processes available . . .

Lastly, if the jury finds the foregoing evidence to be convincing, it could choose to disbelieve Defendants' proffered reasons for Plaintiff's termination.  At such time, Defendants' entire case could collapse in the eyes of the jury because

> "[p]roof that [a defendant's] explanation is unworthy of
> credence . . . may be quite persuasive. In appropriate
> circumstances, the trier of fact can reasonably infer from the
> falsity of the explanation that the employer is dissembling to
> cover up a discriminatory purpose. Such an inference is

consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."

*Id.* at 16 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000)). In sum, a jury could believe Plaintiff, disbelieve Defendants, and hold Defendants' lies against them.

Accordingly, the court declines to grant summary judgment in favor of Defendants on Count I because there is a disputed issue of material fact as to the cause of Plaintiff's termination.

### B. Count II: Common Law Wrongful Discharge

In Count II, Plaintiff alleges a common law wrongful discharge claim. To prove a wrongful discharge claim at Iowa common law, a plaintiff must prove:

(1) The existence of a clearly defined public policy that protects an activity.

(2) This policy would be undermined by a discharge from employment.

(3) The challenged discharge was the result of participating in the protected activity.

(4) There was lack of other justification for the termination.

*Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) (quoting *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003)).

Defendants only challenge Plaintiff's ability to meet the third element of this claim.

Defendants renew their attack on Plaintiff's ability to prove causation: Defendants again assert "there is absolutely no evidence in the present case that the Plaintiff was terminated because he engaged in protected activity or that his engagement in protected activity was a determinative factor in his discharge." For purposes of this Motion, Defendants do not dispute that Plaintiff engaged in a protected activity when he contacted state officials about the Department.

For purposes of this section, the court incorporates its ruling in Part VII.A of this order and likewise declines to grant summary judgment in favor of Defendants on Count II. For the same reasons that a reasonable jury could find Defendants terminated Plaintiff "as a reprisal" for "blowing the whistle," it could also find his discharge "was the result of" "blowing the whistle." "[I]n the wrongful discharge context "the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact." *Id.* (quoting *Fitzgerald*, 613 N.W.2d at 282); *see id.* (declining to rule as a matter of law that plaintiff could not establish causation because the summary judgment record was "murky and conflicted").

### C. Count III: 42 U.S.C. § 1983

In Count III, Plaintiff alleges Defendants violated 42 U.S.C. § 1983 by terminating him for engaging in activity protected by the First Amendment to the United States Constitution. In pertinent part, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Both Engel and the City are potentially liable under Section 1983, because the Supreme Court has held that municipalities are "persons" within the meaning of Section 1983. *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 689 (1978)).

Both the City and Engel claim they are qualifiedly immune from suit under Section 1983 but for different reasons. In the alternative, the City and Engel claim Plaintiff cannot establish causation for his Section 1983 claim. For purposes of the instant Motion, Defendants concede that Plaintiff engaged in constitutionally protected speech when he voiced his concerns to public officials about cronyism in the Department.

### 1. *The City*

The City contends it is qualifiedly immune from suit under Section 1983 because there is no evidence it has a policy or custom of depriving its employees of their constitutional rights to free speech. Absent such a policy or custom, the City claims a municipality is immune from suit under Section 1983.[11]

The Supreme Court requires "a plaintiff seeking to impose liability on a

---

[11] Although not mentioned in the body of this Order, in his Petition at Law, Plaintiff also claims the City is liable under Section 1983 for inadequate hiring and training practices. In the Motion, the City claims summary judgment on this aspect of Plaintiff's Section 1983 claim is warranted because Plaintiff is qualifiedly immune insofar as Plaintiff has not presented any evidence that the failure to train evinces a deliberate indifference to Plaintiff's constitutional rights. *See, e.g., Andrews v. Fowler*, 98 F.3d 1069, 1076-77 (8th Cir. 1996) (discussing elements of proof for inadequate hiring and training under Section 1983). Plaintiff does not respond to the City's argument. Where the nonmoving party fails to respond to a motion for summary judgment, "summary judgment, if appropriate, shall be entered . . . ." Fed. R. Civ. P. 56(c). Because Plaintiff has not presented sufficient evidence to prove a failure-to-hire-or-train claim, the court shall grant summary judgment as to this aspect of Plaintiff's Section 1983 claim. The court shall consider this aspect of Plaintiff's claim conceded for purposes of trial.

municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Brown*, 520 U.S. at 403 (citations omitted). A "policy" must be an "[o]fficial policy [that] involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Jane Doe A ex rel. Jane Doe B. v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 645 (8th Cir. 1990)). To prove a "custom," the plaintiff must show:

> "(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation."

*Id.* (quoting *Jane Doe A.*, 901 F.2d at 646).

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Brown*, 520 U.S. at 403-04 (citation omitted).

The City contends Plaintiff cannot show that the City has either a policy or custom of suppressing the free speech rights of its employees by forbidding them to talk to public officials about cronyism in its departments. Defendants point out that (1) Plaintiff has not pointed to an official policy of the City to this effect and (2) Plaintiff has no proof of any instances where a city employee was discharged for whistleblowing. The gist of City's argument is that, even if Plaintiff could show that Engel fired Plaintiff for exercising his free speech rights, the City should not be held liable under Section 1983 for her rogue actions.

Plaintiff does not cite any official policy of the City to suppress free speech. Plaintiff contends that Engel's statements at the Predisciplinary Hearing evidence a "custom, designed to prevent the free exercise of speech, that was used to punish the Plaintiff for his exercise of that fundamental right."[12] Plaintiff relies upon Engel's remarks at the Predisciplinary Hearing, in which, according to Plaintiff, she "talk[ed] about the processes and mechanisms intended to keep matters of concern internal and prevent the involvement of persons outside the [D]epartment."

The court finds Plaintiff has presented insufficient evidence of a municipal custom to hold the City liable under Section 1983. At the Predisciplinary Hearing, Plaintiff stated that she fired Plaintiff because he went "outside the system" and did not "work within the system and [use] mechanisms available to us from within the [D]epartment." Engel also mentioned that the City had "certain processes available" to resolve Plaintiff's concerns about cronyism. Even accepting Engel's representations as true, the mere fact the City had processes to deal with personnel matters internally (as most corporations and government bodies do) does not amount to a policy to suppress free speech.

---

[12] Plaintiff does not cite any legal authority for his argument.

The only evidence that the City had a custom of suppressing the free speech rights of its employees is the possibility that the City fired Plaintiff for doing so. The court finds this single incident is insufficient to establish a custom. "A single incident normally does not suffice to prove the existence of a municipal custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (citing *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion) and *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) (finding that one instance of a police department's departure from its hiring procedures did not suffice to show the department normally hired officers without proper regard for community safety)); *see also* Oxford English Dictionary ____ (2d ed. 1989) (defining custom as "[a] habitual or usual practice; common way of acting; usage, fashion, habit"). Plaintiff has presented no evidence that the City has fired other employees for exercising their free speech rights or any other evidence of a custom. Because he has only alleged a single incident and nothing else, Plaintiff has not shown it is the custom, i.e., the habit or the usual practice, of the City to suppress free speech.[13]

---

[13] Plaintiff cannot claim a custom of violating free speech rights on account of Engel and Schmelzinger's repeated attempts to shield preferred contractors from his inspections and citations. Plaintiff has no free speech interest in performing the duties of his job, including the issuance of citations, the inspection of properties and writing memoranda to his superiors urging enforcement of the City Code. *See Garcetti v. Ceballos*, No. 04-473, 2006 WL 1458026, at *8 (U.S. May 30, 2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Plaintiff clearly has a free speech interest in informing state officials about cronyism in the Department. *See id.* (recognizing that a public employee has a free speech interest in writing letters to the editor, because such letters have "no official significance and b[ear] similarities to letters submitted by numerous citizens every day") (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County.*, 391 U.S. 563 (1968)). The problem here is that

(continued…)

Accordingly, the court shall grant summary judgment as to the City on Count III.

## 2. *Engel*

### a. *Qualified Immunity*

Engel claims she is qualifiedly immune from suit under Section 1983. For purposes of her argument, Engel admits that she fired Plaintiff "in part for engaging in constitutionally protected speech." She contends, however, that because she had other good reasons for terminating Plaintiff, such as Plaintiff's alleged dishonesty and insubordination, "no reasonable official in her position would have known that terminating . . . Plaintiff . . . violated clearly established constitutional rights." Engel urges the court to adopt the reasoning of a line of Eleventh Circuit Court of Appeals cases, which Engel contends stand for the proposition that, if there is a mixed motive for firing an employee, a defendant is entitled to qualified immunity. *See, e.g., Stanley v. City of Dalton, Ga.*, 219 F.3d 1280 (11th Cir. 2000); *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996). Engel contends that, "even if [Plaintiff] is successful in showing his speech was a substantial motivating factor in the decision to terminate him, [she] may still prevail by showing that there is no question of fact as to whether [s]he would have taken the same action absent the protected speech." Engel claims these Eleventh Circuit cases should be followed because "the law in the Eighth Circuit is not clearly established such that a reasonable official with mixed motives for firing an employee would know their [sic] conduct violates the employee's First Amendment rights."[14]

---

[13](...continued)
Plaintiff has not shown that the City has a custom of suppressing such speech.

[14] Engel also claims *Sexton v. Martin*, 210 F.3d 905 (8th Cir. 2000), lends support for the view that a defendant in a mixed motives case cannot be held liable under Section
(continued...)

The court need not decide whether Defendant's interpretation of Eleventh Circuit jurisprudence is correct or whether the court should adopt that jurisprudence here. It is sufficient to point out, once again, that there is a genuine issue of material fact as to the reason or reasons why Engel fired Plaintiff. A premise of Engel's argument is that "there is no question of fact . . . [that she] would have taken the same action absent the protected speech." As the court has repeatedly pointed out, however, a reasonable jury could find Engel fired Plaintiff because he spoke out about cronyism in the Department and might find Engel's other purported reasons to be after-the-fact justifications to fire an employee with an otherwise clean disciplinary record and a conscientious work ethic.

Accordingly, the court declines to grant summary judgment on Count III as to Engel on qualified immunity grounds.

### b. Causation

In the alternative, Engel claims Plaintiff cannot establish causation. Specifically, Engel claims (1) Plaintiff's constitutionally speech was not a substantial or motivating factor in the decision to terminate his employment and (2) in any event, Engel would have

---

[14](...continued)
1983. Engel seizes on the fact that the Eighth Circuit Court of Appeals in *Sexton* held that the plaintiff must assert the violation of a "clearly established" constitutional right. *Sexton*, 210 F.3d at 909. Engel takes the *Sexton* language out of context, however. The issue in *Sexton* was whether the constitutional right itself, *e.g.*, freedom speech, is clearly established *in the law*, not whether the defendant had a mixed motive. *See, e.g., id.* (explaining that, "'for a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (quoting *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998)). Engel does not dispute that Plaintiff's speech was on "a matter of public concern." Nor does Engel argue that the employer's interest in "'promoting the efficiency of the public services it performs through its employees'" outweighs the interest of Plaintiff, "'as a citizen, in commenting upon matters of public concern.'" *Id.* at 910 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

taken the same action regardless of whether he had spoken out. Engel reiterates Defendants' argument that "there is absolutely no evidence that . . . Plaintiff's engagement in constitutionally protected speech played any part in . . . Defendants' decision to terminate him."

Once again, Engel's argument is directed at Plaintiff's ability to prove causation. The causation standards for Section 1983 claims are, for all practical purposes in this case, the same as those set forth in the court's discussion of Plaintiff's whistleblower and wrongful discharge claims. In a Section 1983 claim, causation is generally a jury question; only if the issue of cause is "so free from doubt as to justify taking it from the jury," should the court enter summary judgment. *Ricketts*, 36 F.3d at 789-90; *see also Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 739 (8th Cir. 2001) (same). The court has already held that Plaintiff has presented sufficient evidence for a reasonable jury to find that Defendants fired Plaintiff because he was speaking out about cronyism in the Department, not because of insubordination or lying. The court, therefore, likewise declines to grant Engel's Motion on Count III on causation grounds.

## VIII. CONCLUSION

**IT IS THEREFORE ORDERED THAT** Defendants' Motion for Summary Judgment (docket no. 13) is **GRANTED IN PART AND DENIED IN PART:**

(1)     The court **DENIES** Defendants' Motion for Summary Judgment as to Counts I and II;

(2)     The court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment as to Count III;

(3)     Defendant City of Cedar Rapids is **DISMISSED** from Count III on grounds of qualified immunity; and

(4)     This matter shall proceed to trial as scheduled as to both Defendants on

Counts I and II, and as to Defendant Engel on Count III.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA